# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IN THE MATTER OF THE EXTRADITION OF JOSE MANUEL CERVANTES ACEVEDO** ) ) ) ) ) | **NO. ED CV 16-1766-R (KS)** **CERTIFICATION OF EXTRADITABILITY** |
| **A Fugitive from the Government of Mexico.** ) ) ) | |
| _____ ) ) ) | |

## BACKGROUND

The Government of Mexico has requested the extradition of Jose Manuel Cervantes Acevedo ("Acevedo"). Acevedo opposes extradition.

On November 9, 2012, the Government of the United States ("Government") filed a "Complaint for Arrest Warrant and Extradition" pursuant to 18 U.S.C. section 3184 "In the Matter of the Extradition of Jose Manuel Cervantes Acevedo," in case number 12-mj-406. Extradition is sought pursuant to the Extradition Treaty between the United States of America and the United Mexican States, 31 U.S.T. 5059, T.I.A.S. 9656 ('the "Treaty"). (*See*

Complaint, redacted Exhibit 1 in case no. 12-MJ-406, Dkt. No. 1.) Acevedo was arrested in this District on April 18, 2016.

On August 17, 2016, the Government filed its sealed "Original Formal Extradition Papers Without Copies or Service of Original Formal Extradition Document; and related Exhibits (Dkt. No. 19), along with a Redacted Copy of Formal Extradition Papers, and Request for Extradition (the "Request for Extradition"). (Dkt. No. 27.)[1] The Request for Extradition included, at Exhibit A, the original formal extradition documents; and, at Exhibit B, a diplomatic note from the Government of Mexico bearing ribbons and seals. (Dkt. No. 27.) Also on August 17, 2016, the matter was referred to the undersigned United States Magistrate Judge (Dkt. No. 20), and this civil matter was consolidated with the criminal filings made in the matter captioned "In the Matter of the Extradition of Jose Manuel Cervantes Acevedo, A Fugitive from the Government of Mexico," case number 12-MJ-406. (Dkt. Nos. 21, 22).

On January 30, 2017, the Government filed the "United States' Extradition Memorandum" ("Government's Memorandum"). (Dkt. No. 39.) On March 30, 2017, Acevedo filed his Opposition to Request for Extradition ("Opposition"), along the Declaration of Silvester Cervantes Acevedo ("Silvester Decl." or "Silvester Declaration") ; Declaration of Alejandro Cervantes Acevedo ("Alejandro Decl." or "Alejandro Declaration"); and Exhibit A, which is a copy of a Certificate of Live Birth for Jose Manuel Cervantes issued by the Los Angeles County Clerk. (Dkt. No. 43.) On June 8, 2017, the Government filed a Memorandum in Opposition to Jose Manuel Cervantes Acevedo's Opposition (the "Reply"). (Dkt. No. 48.) On June 20, 2017, the Government filed a "Supplement To Government's Reply in Support of Its Extradition Memorandum;" a Memorandum of Points and Authorities; and Declaration of John J. Lulejian with an

---

[1] Docket No. 27 is the redacted copy of the Formal Extradition Papers and Request for Extradition.

accompanying redacted exhibit ("Gov't's Supplemental Reply"). (Dkt. No. 50.) The exhibit to the Gov't's Supplemental Reply includes a diplomatic note from the Embassy of Mexico to the U.S. Department of State and a certified translation of an affidavit from Esmeralda Garciá Cervantes ("Garciá Cervantes"), former Public Prosecutor at the Attorney General's Office of Michoacan State, who took Alejandro's 2007 sworn statement as an eyewitness to the murder of Prado Gonzales. (Dkt. No 48, Ex. A. at pp. 3 (diplomatic note); 7-8 (affidavit).) Exhibit A also includes a document authenticating Garciá Cervantes's affidavit. (*Id.* at p. 10.)

The Magistrate Judge held an extradition hearing on June 21, 2017. (Dkt. No. 53.) Following the extradition hearing, the Court issued a Minute Order permitting Acevedo to file a response to the Gov't's Supplemental Reply and the 2017 affidavit from former Michoacan prosecutor, Garciá Cervantes. (*See* Dkt No. 54.) On July 14, 2017, Acevedo filed a "Supplemental Response to Government's Supplement to Government's Reply in Support of its Extradition Memorandum" ("Acevedo's Supp. Response"). (Dkt. No. 58.) The matter is now fully briefed and under submission for decision without further oral argument.

## FINDINGS AN CONCLUSIONS RE: EXTRADITION

## I. <u>Jurisdiction</u>

This Court has jurisdiction to conduct extradition proceedings pursuant to 18 U.S.C. section 3184, Local Rule 72-1, and General Order No. 05-07 of the United States Court for the Central District of California. The Court has jurisdiction over Acevedo pursuant to the personal jurisdiction requirements of 18 U.S.C. section 3184 because Acevedo was "found" in this district when he was arrested in Riverside County on the extradition warrant on April

18, 2016.  *See In re Extradition of Emilio Valdez Mainero,* 990 F. Supp. 1208, 1216 (S.D. Cal. 1997) (hereafter "*Mainero*").

## II.    Treaty

The Treaty is in full force and effect.  *See* Complaint ¶ 2, Exhibit 1, (Treaty) [Dkt. No. 1 in case no. 12-MJ-406]; Government's Extradition Memorandum at 14.

## III.    Identity

Acevedo, a United States citizen, does not contest identity.[2]  *See* Government's Extradition Memorandum at 14; Opposition at 3. The Jose Manuel Cervantes Acevedo appearing before this Court is the same Jose Manuel Cervantes Acevedo sought by the Government of Mexico.

## IV.    Request for Extradition; Procedural Requirements

The Request or Extradition filed with this Court by the Government of Mexico, as augmented by subsequent filings, complies with the procedural requirements of the Treaty.

## V.    Charge

A criminal complaint is pending against Acevedo in the community of Jaripo, Municipality of Villamar Michoacan, Mexico, charging Acevedo with aggravated homicide for the stabbing death of his cousin, Rigoberto Prado Gonzalez ("Prado Gonzalez"), on July 14, 2007.  Request for Extradition [Dkt. No. 27 at pp. 1-12].

---

[2]    There is no legal bar precluding extradition of a United States  citizen to a foreign country.  *Charlton v. Kelly*, 229 U.S. 447, 467 (1913); *and see Mainero*, 990 F. Supp. at 1227-28 (finding probable cause for extradition of U.S. citizen to Mexico on homicide charges).

According to the evidence submitted by Mexico, Acevedo allegedly violated "articles 260, 279, section I, paragraph 7, section 1, paragraph 17, section I and provided for by article 267 of the Criminal Code of the State of Michoacan, which was in force at the time of the facts [alleged in this proceeding]." *Id*. at 6; and Request for Extradition (Affidavit of Daisy Alvarez Zavala attaching relevant portions of Federal Criminal Procedure in Mexican Law (State of Michoacan) and Criminal Code of the State of Michoacan), *see* Dkt. No. 27-1 at pp. 4-5; 6-8.[3]

Article 260 provides: "The crime of homicide is perpetrated by whomever takes another's life." (*Id*.) Article 267 calls for "[a]n imprisonment penalty from twenty to forty years shall be imposed upon the person who commits an aggravated homicide." (*Id*.) Finally, Article 279 of the Michoacan Criminal Code defines aggravated homicide as follows:

> Bodily injuries and homicide are aggravated when
>
> I.    They are committed with premeditation, unfair advantage, malice of aforethought or treachery. Premeditation exists when the defendant intentionally causes an injury, after having thought over the crime he is going to commit. Unfair advantage exists when the perpetrator does not run the risk of been [sic] killed or injured by the victim. Malice of aforethought exists when someone is intentionally taken by surprise or when the perpetrator lies in wait for the victim. Treachery exists when there is a breach of the trust or of the protection that the victim had a right to expect from the person accused.

(*Id*.)

---

[3]    Exhibits 1-10 attached to the Request for Extradition are not sequentially numbered, therefore, for ease of reference, the Court cites to these documents using the page identifiers assigned by the court's CM-ECF docketing system.

5

## VI. Dual Criminality

The Treaty provides that "[e]xtradition shall be granted only if the evidence be found sufficient, according to the laws of the requested Party . . . to justify the committal for trial of the person sought if the offense of which he has been accused had been committed in that place. Treaty, art. 3, May 4, 1978, T.I.A.S. no. 9656 (Complaint, Ex. 1.) "Dual criminality exists if the 'essential character' of the acts criminalized by the laws of each country are the same and the laws are 'substantially analogous.'" *Manta v. Chertoff*, 518 F.3d at 1141. The scope of liability need not be the same. *Id.* In determining whether dual criminality exists, the Court must consider "the totality of the conduct alleged." *Man-Seok Choe v. Torres*, 525 F.3d 733, 737 (9th Cir. 2008), *cert. denied*, 555 U.S. 1139 (2009) (citation and internal quotations omitted). In other words, to support extradition, this Court must determine whether, based on the evidence, the accused could be brought to trial for the same crime in the United States.

Acevedo is sought by Mexico for alleged aggravated homicide. Acevedo does not dispute that the crime of aggravated homicide is punishable under both the Treaty and California law. Indeed, Acevedo stipulates that all the elements for extradition have been satisfied except probable cause. (Opposition at 3.) Thus, the Court finds that the dual criminality requirement is satisfied.

## VII. Limited Nature of Present Proceedings

The Ninth Circuit has emphasized the very limited role of the court in extradition proceedings:

> An extradition court – in this case the magistrate judge – exercises very limited authority in the overall process of extradition. As we have explained,

"[e]xtradition is a matter of foreign policy entirely within the discretion of the executive branch, except to the extent that the statute interposes a judicial function" [citations omitted]. Extradition from the United States is initiated when the nation seeking extradition makes a request directly to the State Department [citation]. "After the request has been evaluated by the State Department to determine whether it is within the scope of the relevant extradition treaty, a United States Attorney . . . files a complaint in federal district court seeking an arrest warrant for the person sought to be extradited." [citation]. Upon the filing of a complaint, a judicial officer (typically a magistrate judge) issues a warrant for an individual sought for extradition, provided that an extradition treaty exists between the United States and the country seeking extradition and the crime charged is covered by the treaty. 18 U.S.C. § 3184. After the warrant issues, the judicial officer conducts a hearing to determine whether there is "evidence sufficient to sustain the charge under the provisions of the proper treaty or convention," *id.*, or, in other words, whether there is probable cause.

*Vo v. Benov*, 447 F.3d 1235, 1937 (9th Cir.), *cert. denied*, 549 U.S. 935 (2006).

Because of the limited nature of the proceedings, the person whose extradition is sought is not entitled to the rights available to a defendant in a criminal trial in the United States. *See Neely v. Henkel*, 180 U.S. 109, 122 (1901); *In the Matter of the Extradition of Smyth,* 61 F.3d 711, 720-21 (9th Cir.1995). Neither the Federal Rules of Criminal Procedure nor the Federal Rules of Evidence apply to extradition proceedings. *See* Fed. R. Crim. P. 1(a)(5) (rules not applicable to "extradition and rendition of a fugitive."); Fed. R. Evid. Rule 1101(d)(3) (except for rules on privilege, evidence rules "do not apply to. . . extradition or rendition").

In determining whether the crime is extraditable and whether probable cause exists, the Magistrate Judge "has no discretionary decision to make." *Prosoprat v. Benov*, 421 F.3d 1009, 1012 (9th Cir. 2005), *cert. denied*, 546 U.S. 1171 (2006) (citations and internal quotations omitted). "If the judge or magistrate judge concludes that 'the crime is extraditable,' and that 'there is probable cause to sustain the charge,' the judge or magistrate judge must certify the extradition." *Manta v. Chertoff*, 518 F.3d 1134, 1140 (9th Cir. 2008) (internal citation omitted). "Once a magistrate judge confirms that an individual is extraditable, it is the Secretary of State, representing the executive branch, who determines whether to surrender the fugitive." *Blaxland v. Commonwealth Director of Public Prosecutions*, 323 F.3d 1198, 1208 (9th Cir. 2003).

## VIII. Evidence

### A. Government's Evidence

#### a. Alejandro's 2007 Sworn Witness Statement

In support of its Request for Extradition, the Government has submitted certified translations of the following documents: (1) a translation of the arrest warrant issued on August 23, 2007 by the Criminal Trial Court Judge of the Judicial District for Jiquilpan de Juraez, Michoacan against Acevedo for "his probable responsibility for the commission of the crime of aggravated homicide" (Request for Extradition, Ex. 1, Dkt. No. 27);   (2) the applicable legal provisions establishing the elements of the crime of aggravated homicide, along with the applicable penalties and statute of limitations based on the Criminal Code of the State of Michoacán (*id.*, Ex. 2); (3) judicial certification from the Michoacan Trial Court Judge indicating that the statute of limitation for the criminal action against Acevedo is July 20, 2037 (*id.,* Ex. 3); (4) a sworn witness statement given on July 15, 2007 by Alejandro Cervantes Acevedo ("Alejandro") (*id.*, Ex. 4; (5)  witness statement given on July 17, 2007

by Eduardo Ceja Bañales ("E.C.B.") (*id.*, Ex. 5); (6) a witness statement given in July 2007 by Tomas Ceja Valencia ("T.C.V.") (*id.*, Ex 6); (7) a Forensic Legal Autopsy Certificate for an autopsy performed on July 15, 2007 on the body of Rigoberto Prado Gonzalez and issued "by the forensic medical expert assigned to the office of the Attorney general of the State of Michoacan" (*id.,* Ex. 7); (8) an identification statement given by E.C.B. before a Michoacan Public Prosecutor in February 2010 in which E.C.B. identified Acevedo's photo from a 6-person photo array (*id.*, Ex. 8); (9) certified copy of Acevedo's birth certificate (*id.*, Ex. 9); and (10) photographs of Acevedo (*id.*, Ex. 10).

On the day after Prado Gonzalez's death, Alejandro gave a sworn statement to Michoacan prosecutor, Garciá Cervantes, in which he recounted the circumstances leading up to Prado Gonzalez's death as follows:

On July 14, 2007 at approximately 5:30 p.m., Alejandro ran into his cousin, Prado Gonzalez. (Request for Extradition, Ex. 4 [Dkt. No. 27 at p. 9].) Alejandro and Prado Gonzalez planned to go dancing but first they went to a ranch and drank beer. (*Id.*) Later the same evening, they drove to the town of Jaripo. (*Id.*) At 11:00 p.m. they arrived at the corner of Lazaro Cadenas and Independencia Street and planned to buy more beers but the corner store was closed. (*Id.* at 9-10.) Alejandro and Prado Gonzalez then approached some guys who were drinking at the corner and asked if they had beers. (*Id.* at 10.) Acevedo, Alejandro's brother, was among the group of men. (*Id.*) Acevedo asked Alejandro "what the fuck was going on" and started to argue with Alejandro. (*Id.*) A friend in the group asked Alejandro "how they were going to fight if they were brothers." (*Id.*) Prado Gonzalez approached and told Acevedo "what's up cousin and Acevedo replied "do you want to know who I am." (*Id.*) Prado Gonzalez asked Acevedo to calm down, and Acevedo answered "do you want to see what I have?" (*Id.*)

Alejandro told Garciá Cervantes that Acevedo took out an iron-sharpened object with a leather cover and started to chase Prado Gonzalez. (*Id.*)  As another member of the group tried to calm Acevedo, Prado Gonzalez tripped and fell.  (*Id.*)  While Prado Gonzalez was on the ground, Acevedo stabbed him several times in the stomach. (*Id.*)  Acevedo then fled on a bicycle. (*Id.*)  Alejandro with two other men, E.C.B. and R.A., put Prado Gonzalez in a truck and took him to E.C.B.'s father who was a doctor in Jaripo.  (*Id.*)  The doctor told them he could not help Prado Gonzalez.  His injuries were too severe and they needed to take him to Juquilpan. (*Id.*)  While driving to Jiquilpan, they ran off the road and eventually got help from a passing car driven by E.C.B.'s brother, T.C.B., who drove them the rest of the way to the hospital in Jiquilpan, Mexico.  (*Id.*)  When they arrived at the hospital, a doctor declared Prado Gonzalez dead. (*Id.* at 10-11.)

Alejandro's 2007 witness statement indicates at the conclusion that "the appearing person read and expressed agreement with its content and signed at the bottom margin of the present record for duly and legal Record." (*Id.* at 11.)

### b.  Other Witness Statements

E.C.B. also provided a sworn statement to Garciá Cervantes. (Request for Extradition, Ex. 5, [Dkt No. 27 at pp. 13-14].)  E.C.B. saw Alejandro and the Prado Gonzalez approach but was talking about soccer with Ramiro Acevedo and did not see the stabbing. (*Id.* at 13.) He heard yelling for a "doctor, a doctor" and ran to get his father, who was a doctor. (*Id.*) Alejandro and R.A. drove Prado Gonzalez to the doctor's home in the pickup but E.C.B. did not realized Prado Gonzalez had been stabbed until the doctor  told them they needed to get Prado Gonzalez to a hospital. (*Id.*)  After the pickup ran off the road trying to reach Jiquilpan, E.C.B. did not continue on to the hospital with Alejandro and Prado Gonzalez. (*Id.* at 14.)  He later learned from his parents that Prado Gonzalez had died. (*Id.*) E.C.B.  said, "It was until the following day that I heard in the town that it had been [Acevedo] but I did not witness it

because I did not see anything at that moment." (*Id.*)  E.C.B. later identified Acevedo in a photo lineup.  (Request for Extradition, Ex. 8.)

In July 2007, T.C.V., the Jaripo doctor, gave a sworn statement to Garcia Cervantes in which he confirmed that he had seen Prado Gonzalez in the pickup on the night of the incident and told Alejandro to "take him to the Regional Hospital of Sahuayo Michoacan because said injured person was in very bad conditions." (Request for Extradition, Ex. 6 [Dkt. No. 27 at p.16].)  When he heard that his other son had helped get Prado Gonzalez to the hospital, the doctor drove to the regional hospital where he learned that the victim had already died. (*Id.*)

On July 15, 2007, an autopsy was conducted on Prado Gonzalez. (Request for Extradition, Ex. 7 [Dkt. No. 27 at pp. 19-21].)  The autopsy determined that Prado Gonzalez had suffered three separate bodily injuries to the abdomen "caused by a sharp weapon" and the cause of death was "hypovolemic shock after a laceration of thoracoabdominal viscera by a sharp weapon." (*Id*. at pp. 20-21.)

### c.  Michoacan Prosecutor's  2017 Supplemental Declaration

In addition to the witness statements, photographs, and autopsy report submitted with the Extradition Request, on July 19, 2017, the Government filed a Supplemental Reply in Support of its Extradition Memorandum  attaching  a diplomatic note transmitting a certified translation of a declaration by now-former Michoacan prosecutor, Garciá Cervantes, who had taken the original sworn witness statements in July 2007 of Alejandro, E.C.B., and T.C.V.  In her 2017 declaration, Garciá Cervantes states that she took Alejandro's statement "without coercion of any type used against [Alejandro Cervantes Acevedo] since he himself stated everything he knew regarding the facts . . . Thus he freely and voluntarily appeared as eyewitness."  Supplemental Reply, Exhibit A [Dkt. No. 58 (redacted version)].  The

prosecutor further confirmed that during the 2007 interview, "the information was freely and voluntarily provided by ALEJANDRO CERVANTES ACEVEDO while chatting with me. Once said proceeding ended, the statement was read aloud prior to be signed at the end and margin by the deponent." (*Id.* (capitalization in original)).

### B. Acevedo's Evidence

Acevedo, through counsel, stipulates "that the first four requirements for extradition have been met," i.e., (1) the court's jurisdiction to conduct the extradition proceedings; (2) the court's jurisdiction over the fugitive; (3) that the extradition treaty is in full force and effect; and (4) the crime falls within the treaty. (Opposition at 3.) Acevedo opposes extradition, however, arguing that sufficient probable cause has not been established to support extradition by "competent legal evidence." (Opposition at 3-5.) Specifically, Acevedo contends that there is "insufficient probable cause to support a finding that Jose Manuel Cervantes Acevedo is responsible for the death of Rigoberto Prada [sic] Gonzalez." (*Id.* at 3.)

In support of his contention, Acevedo presents two declarations: the Declaration of Silvester Cervantes Acevedo ("Silvester Decl."), dated March 26, 2017; and a Declaration of Alejandro Cervantes Acevedo dated March 20, 2017 at Douglasville, Georgia and translated from English to Spanish by certified interpreter, Adrian Bernal ("Alejandro 2017 Decl.").

### 1. Declaration of Silvester Cervantes Acevedo

Silvester Acevedo states that he is Acevedo's brother and Prado Gonzalez was his "second cousin." Silvester Decl. ¶¶ 1-2. He states that his father died in Jaripo, Mexico on June 20, 2007 and he and Acevedo traveled from California to Jaripo to attend their father's funeral, which took place on June 22, 2007. *Id*. at ¶¶ 5-7. Silvester and Acevedo "decided to stay in Jaripo for a few additional weeks to help [their] mother maintain [the] family's ranch."

*Id.* at ¶ 8. Silvester states that "[i]n 2007, La Familia, was the dominate drug trafficker and organized crime cartel in the State of Michoacan" and he "believe[s] Gonzalez was involved with La Familia." *Id.* at ¶¶9-10. Silvester goes on to state that, on July 14, 2007, "Gonzalez was yelling criminal threats directed at Cervantes Acevedo. Threats such as Gonzales [sic] was going to kill Cervantes Acevedo." *Id.* at ¶12. Silvester states that someone named "Eva" "called Ramon Figueroa, president of Jaripo at the time, to report those threats Gonzalez had made regarding Cervantes Acevedo." *Id.* at ¶13.

"At approximately 9 p.m. [Silvester] gave [Acevedo] and his friend a ride into town to meet other persons at the local convenience store," and while driving into town he "was stopped by local law enforcement, who were searching for Alejandro and Gonzalez, both allegedly were wanted for questioning and suspects in other criminal activity involving an altercation with older men in the town of La Presa." *Id.* at ¶¶14-15. Silvester "told law enforcement Alejandro and Gonzalez came to [his] mother's ranch that night, but [Silvester] did not know their current location." *Id.* at ¶ 16. "Law enforcement allowed [them] to proceed into town" where Silvester says he "dropped [Acevedo] and his friend off at the local convenience store" where "approximately another dozen or more men [were] present" and "immediately went home." *Id.* at ¶¶ 16-19.

Silvester states that he was awakened at 3 a.m. by local law enforcement searching for Acevedo and at that time he "learned of the alleged incident" and was "informed Alejandro was in custody." *Id.* at ¶20. He says that "in the morning, my mother and I went to the jail to figure out what allegedly occurred the previous evening" and he "was approached by four of Gonzalez's family members, who threatened to kill me." *Id.* at ¶ 21-24. He says because of "death threats by Gonzalez's family, my mother and younger sister, Karina Cervantes Acevedo applied for vistas to the United States" and "[a]t no time, thereafter, am I aware of my brother, Alejandro telling any of my friends or family that my brother [Acevedo], stabbed or killed Gonzalez or anyone." *Id.* at ¶¶24-25.

13

## 2. **Alejandro's 2017 Declaration**

In a declaration dated March 20, 2017, Alejandro states that he is the older brother of Acevedo, and is currently incarcerated at Douglas County Jail located in Douglassville, Georgia. Alejandro Decl. at ¶¶1-2. He describes the events of July 14, 2007, stating that he was with Prado Gonzalez in Jaripo, Mexico and "[t]hat evening a fight did break out, resulting in Gonzalez's injurie(s)." *Id.* at ¶¶3-4. Alejandro says "I do not know who caused the injurie(s) to Gonzalez as there were at least a dozen men involved arguing with Gonzalez the night of July 14, 2007." *Id.* at ¶5. After the fight, Alejandro states he "assisted in transporting Gonzalez to a doctor for medical assistance" and "was subsequently, arrested by Mexican authorities the evening of July 14, 2007." *Id.* at ¶¶6-7.

Alejandro asserts, "I only signed the declaration dated July 15, 2007 implicating my brother, [Acevedo], of the murder of Gonzalez because of coercion by the Mexican government." *Id.* at ¶8. He further states in the 2017 declaration that, "at the time I signed the declaration, I was incarcerated in Mexico. I was told by Mexican Authorities that if I signed the declaration I would be released, but if I refused I would not only stay in custody but would also be charged with Gonzalez's murder." *Id.* at ¶9. He says, he knew "at the time, Gonzalez was involved with the La Familia, a dominate drug trafficking and organized crime cartel in the State of Michoacán" and "[f]urthermore, I know, Gonzalez's family was paying Mexican authorities to investigate the alleged murder of Gonzalez." *Id.* at ¶¶ 10-11. He says that "the next day after I signed the declaration I was released from custody" and "was never again questioned by Mexican authorities regarding the alleged murder of Gonzalez." *Id.* at ¶¶12-13.

//
//
//
//

### C. Admissibility Issues

In an extradition proceeding, the accused is not entitled to introduce evidence that goes to his defense, but he may offer limited evidence to explain elements in the case against him that would negate a finding of probable cause. *Barapind v. Enomoto*, 400 F.3d 744, 749 (9th Cir. 2005). Further, hearsay statements are competent evidence to support extradition. *Emami v. U.S. Dist. Court for Northern District of California*, 834 F.2d 1444, 1451 (9th Cir. 1987). *In re Ryan*, 360 F. Supp. 270, 273 (E.D.N.Y. 1973), *aff'd sub nom. In re Christensen*, 478 F.2d 1392 (2d Cir. 1973) ("A determination of probable cause in an extradition proceeding may rest entirely upon hearsay.") Documents may be received and admitted as evidence if they are "properly and legally authenticated so as to entitle them to be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped." 18 U.S.C. § 3190.

### 1. Government's Evidence

Here, the sworn affidavits and witness statements submitted with the Request for Extradition, including Garciá Cervantes's 2017 affidavit attached to the Government's Supplemental Reply, have been legally authenticated and the translations certified. Accordingly, these documents are received into evidence.

### 2. Acevedo's Evidence

#### a. Silvester Declaration is Inadmissible

In his declaration, Silvester Cervantes Acevedo's assertions include: "I believe Gonzalez was involved with La Familia" (Silvester Decl. ¶ 10); that "Gonzalez was yelling criminal threats directed at Cervantes Acevedo" (*id.* at ¶ 12); and that "[d]ue to death threats

by Gonzalez's family, my mother and younger sister, Karina Cervantes Acevedo applied for visas to the United States" (*id.* at ¶ 24). Silvester admits that he "immediately went home" after dropping Acevedo off at the convenience store, so he was not at the scene when Gonzalez was stabbed. (*Id.* at 19.)

Silvester's statements appear to contradict the testimony of witnesses that prosecutor Garciá Cervantes interviewed in Mexico on the day after the killing and seem designed to establish a self-defense narrative to explain Acevedo's actions. This is just the type of evidence that is not admissible in an extradition proceeding. "Evidence of alibi or of facts contradicting the demanding country's proof or of a defense such as insanity may properly be excluded from the Magistrate's [extradition] hearing." *In re: Extradition of Jose Espinoza Chavez*, 408 F.Supp.2d 908, 911 (N.D. Cal. 2005) (*citing Shapiro v. Ferrandina,* 478 F.2d 894, 901 (2d Cir. 1973) (internal quotations omitted)). Consequently, the Silvester Declaration is not admissible in these proceedings. *Ferrandina*, 478 F.2d at 905 (statements that do not explain the government's evidence "but would only pose a conflict of credibility" not admissible in extradition proceeding).

### b. Alejandro's 2017 Coercion Statements

Alejandro's 2017 declaration asserts that his 2007 statement to the Mexican prosecutor, in which he identified Acevedo as the killer, was obtained by coercion. (Alejandro 2017 Decl. at ¶¶8-9.) Acevedo, *citing Santos v. Thomas*, 830 F.3d 987, 1006 (9th Cir. 2016), argues that Alejandro's 2017 declaration is not contradictory evidence, but is admissible as evidence that "explains away" or "obliterates" probable cause. (Opposition at 5.) Furthermore, Acevedo contends that if the Court accepts the evidence of coercion, then this demonstrates that Alejandro's 2007 statement is false, which means there is insufficient evidence to support probable cause for Acevedo's extradition because Alejandro is the only eyewitness who positively identified Acevedo as the assailant. (*Id.*) As discussed below,

Alejandro's 2017 Declaration presents evidence that is both contradictory and potentially explanatory, which, following *Santos*, requires a more nuanced assessment on admissibility.

Courts acknowledge that "[t]he distinction between evidence that 'explains' and evidence that 'contradicts" is a murky one." *Chavez*, 408 F. Supp. at 911. In *Santos*, the Ninth Circuit held that evidence that a witness's inculpatory statement had been obtained through torture and coercion is admissible in an extradition proceeding to the extent that coercion undermined the competence of such evidence. *Santos,* 830 F.3d at 1005. Acevedo contends, therefore, that *Santos* requires that this Court find Alejandro's original witness statement is false and cannot support probable cause to extradite because his 2017 declaration avers that the 2007 statement was coerced by Mexican authorities. (Opposition at 4-5; *and see* Alejandro 2017 Decl. at ¶¶ 8-9.)[4] But Acevedo reads too much into *Santos* and ignores the Ninth Circuit's narrow ruling in that case.

In *Santos*, Mexico sought extradition of a fugitive, Louis Munoz Santos ("Munoz"), wanted for the 2005 kidnapping of a mother and her two young daughter in Nayarit, Mexico. *Santos*, 830 F.3d at 993. The government's evidence in support of extradition included a witness statement given on March 14, 2006 by one of the alleged co-conspirators, Fausto Librado Rosas Alfaro ("Rosas") that implicated Munoz as the lookout during the kidnapping. (*Id.* at 994.) At the extradition hearing, to undermine the government's showing of probable cause, Munoz sought to introduce several statements by witnesses alleging that their prior statements about the circumstances surrounding the kidnapping had been obtained by torture

---

[4] Acevedo also argues that the evidence supporting probable cause is flawed because of inconsistencies between the autopsy report, which indicates that Prado Gonzalez was stabbed three times, and Alejandro's 2007 witness statements that "implies that if [Acevedo] did in fact stab Gonzalez, he did so only once." (*See* Opposition at 5, 7.) In addition, Acevedo contends that the witness statement of E.C.B. (Eduardo Ceje Bañales) " suggesting that he was present at the time of the stabbing is "suspect and more likely than not false." (*Id.* at 8.) However, these arguments raise factual disputes regarding the weight and credibility of evidence. Such determinations are beyond the scope of this extradition proceeding and are properly reserved for trial in the requesting country. *See Collins,* 259 U.S. at 316-17 ("evidence in defense" that merely "contradict[s] the testimony for the prosecution" may be excluded); *Barapind,* 400 F.3d at 750 ("extradition courts 'do[ ] not weigh conflicting evidence' in making their probable cause determinations.")

17

or coercion. (*Id.* at 997.)  In particular, Munoz sought to introduce: (1) a statement by Rosas, given on May 25, 2006 two months after his original statement, in which Rosas retracted his original statement; and (2) another statement by Rosas, made on June 20, 2006 where Rosas "denied the parts of his preliminary statement in which he implicated himself" and alleged that police threatened his family and that "he was beaten and threatened on several occasions while in custody." (*Id.*)  The June 20, 2006 statement detailed the alleged torture, including that "he was tied to a chair, had a bag placed over his head, and was struck repeatedly in the chest while being asked what he knew about the kidnapping," and that he was "held incommunicado for two days" during which time he was periodically beaten.  (*Id.*)  Another co-conspirator gave a similar statement on March 22, 2006, alleging that his initial statement was "false and had been obtained under torture." (*Id.* at 998.)

The extradition court considered the government's evidence and Munoz's evidence offered to rebut the showing of probable cause and concluded that Munoz was extraditable and declined to consider the additional evidence Munoz sought to admit concerning the alleged torture and coercion. *Id.* at 999.  Relying on the Ninth Circuit's analysis in *Barapind* concerning recantation evidence, the extradition court concluded that the statements were inadmissible "contradictory" evidence.  *Id.* (*quoting Barapind*, 400 F.3d at 749).

Munoz challenged the extradition order in a petition for habeas corpus. *Id.*  The district court affirmed, but distinguished between "'recantation' statements that directly contradict a previously offered version of the facts . . . and evidence that a statement was procured by torture."  *Id.* (internal citation omitted). The district court nonetheless concluded that "it was impossible to distinguished between [the co-conspirators'] statements regarding torture, and their recantation of their previous incriminating statements" and found that the torture statements could not be considered, *Id.*   A Ninth Circuit panel affirmed that decision in *Munoz Santos v. Thomas*, 779 F.3d 1021, 1026-28 (9th Cir. 2015), but, after *en banc* review, vacated the panel opinion. *Id.* at 1000 (*citing Munoz Santos v. Thomas*, 804 F.3d 998 (9th Cir.

18

2015).  In the *en banc* opinion, the circuit court held that "[t]he extradition court should have considered the evidence of coercion because a coerced statement is not competent evidence and cannot support probable cause." *Id.* at 1001.

The Ninth Circuit distinguished the recantation statements from those alleging coercion.  It reasoned that the co-conspirators' recantations of their previous admissions were contradictory, because such statements challenge the *credibility* of the original statements, presenting a different version of the facts or offering reasons why the government's evidence should not be believed." *Id.* at 1003.  But "[r]eliable evidence that the government's evidence was obtained by torture or correction . . . goes to the *competence* of the government's evidence." *Id.* (emphasis in original).  Even so, the circuit court concluded it could not resolve the question of whether, after excluding the co-conspirators' confessions, there was sufficient evidence of probable cause to affirm extradition.  *Id.*  Therefore, the Ninth Circuit remanded the case to the district court for further proceedings in the extradition court "to address the competency and the sufficiency of the government's evidence." *Id.*

Applying this analysis here, Alejandro's 2017 statements about coercion are admissible.  But his new statements asserting Prado Gonzalez's alleged involvement in a criminal gang, La Familia, and recasting Gonzalez as the aggressor in the attack, are essentially recantations of his 2007 witness statement and, under *Santos*, these contradictory statements are not admissible.  *Santos*, 830 F.3d at 1003. Alejandro's 2017 assertions of coercion, given some ten years after his original witness statement to the Michoacan prosecutor, do not provide the kind of detailed evidence of torture that the Ninth Circuit considered in *Santos*, but Alejandro nonetheless asserts, albeit in conclusory fashion,  that his original 2007 witness statement was coerced. (Alejandro 2017 Decl., ¶¶8-9.)  Even so, the 2017 declaration does not necessarily explain away  or "obliterate" a finding of probable cause in this case.

*Santos* simply requires that the extradition court *consider* evidence of coercion. As noted, *Santos* did not reach the ultimate issue of probable cause but only ruled on the *admissibility* of the subsequent witness statements containing the allegations of torture. *Santos*, 830 F.3d at 1008 ("Our holding today is narrow: Evidence that a statement was obtained by coercion may be treated as 'explanatory' evidence that is admissible in an extradition hearing.").

## IX.  Probable Cause Determination

"An extradition proceeding is not a trial; the relevant determination is confined to whether a prima facie case of guilt exists that is sufficient to make it proper to hold the extraditee for trial." *Emanmi v. United States District Court for the Northern District of California*, 834 F.2d at 1452. "The function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction." *Collins v. Loisel*, 259 U.S. 309, 316 (1922) (internal citations and quotations omitted). An extradition proceeding thus "makes no determination of guilt or innocence," but is "designed only to trigger the start of criminal proceedings against an accused," and "guilt remains to be determined in the courts of the demanding country." *Sainez v. Venables*, 588 F.3d 713, 717 (9th Cir. 2009), *cert. denied*, 560 U.S. 958 (2010) (citation and internal quotations omitted). The country seeking extradition need not produce all of its evidence, and the Magistrate Judge does not determine whether there exists sufficient evidence to convict. *Id.* at 717; *Quinn v. Robinson*, 783 F.2d 776, 815 n.41 (9th Cir.) *cert. denied*, 479 U.S. 882 (1986) (noting well established rule that extradition proceedings are "not to be converted into a dress rehearsal for a trial") (citation and internal quotations omitted). "[T]he magistrate's function is to determine whether there is any evidence sufficient to establish reasonable or probable cause." *Sainez*, 588 F.3d at 717 (citation omitted).

Acevedo contends that, under *Santos*, Alejandro's 2017 declaration establishes that Alejandro's 2007 statements to the Mexican prosecutor on the night of the killing and implicating Acevedo as the killer was coerced, therefore, the alleged coercion is sufficient prevent a finding of probable cause sufficient to support extradition. (Opposition at 4-6; Alejandro Decl., ¶8.)   The Government, citing *Santos*, responds that Alejandro's 2017 Declaration raises credibility issues that cannot be resolved in the limited nature of these extradition proceedings. (Reply at 3-5.)   Further, the Government presents its own recently obtained evidence in the form of prosecutor Garciá Cervantes's affidavit in which she states that Alejandro's 2007 eyewitness statement was not obtained through coercion.   The Government argues that these competing declarations require the Court to weigh the credibility of Alejandro 2017 coercion statements against the credibility of the Mexican prosecutor, and because an extradition court cannot engage in such credibility determinations, such conflicting evidence does not undermine probable cause for extradition.  (*See* Gov't's Supp. Reply at 1.)  *Santos* fully supports the Government's position.

*Santos* requires that the extradition court *consider* evidence of coercion, but recognizes that the extradition court must still "weigh whether the allegations of coercion are credible, and if so, whether probable cause still exists once the tainted evidence is excluded from the analysis." *Santos*, 830 F.3d at 1004.   When, as here, the issue of coercion is contested, *Santos* counsels that

> [t]he extradition court does not have to determine which party's evidence represents the truth where the facts are contested. Where an extradition court first considers evidence that a statement was improperly obtained, but concludes that it is impossible to determine the credibility of the allegations without exceeding the scope of an extradition court's limited review, the court has fulfilled its obligation . . . If the court cannot determine the credibility of the

allegations (or other evidence) once it has examined them, the inquiry ends. Probable cause is not undermined, and the court must certify the extradition.

*Id.* at 1007.

Here, Garciá Cervantes's authenticated 2017 affidavit states that Alejandro gave his July 15, 2017 statement voluntarily and "without coercion of any type." (Supplemental Reply, Exhibit A.)[5] Even with the admission of Alejandro's 2017 assertions of coercion, the evidence before the Court regarding possible coercion is at best conflicting, i.e., there are two clearly disputed versions of facts regarding the circumstances under which Alejandro gave his 2007 witness statement implicating Acevedo in the Gonzalez murder. After a careful review of the record as a whole, *Santos*, and the oral argument by the parties, the Court finds that Alejandro's 2017 statements about alleged coercion in 2007, while admissible, do not prevent a finding of probable cause sufficient to support extradition under the Treaty.

Alejandro's 2017 Declaration presents a question of the credibility and weight of the conflicting evidence. As noted, in assessing probable cause, the Court does not weigh conflicting evidence and make factual determinations, but determines only whether there is competent evidence to support the belief that the accused committed the charged offense. *Quinn*, 783 F.3d at 815. Here, the Government has presented competent evidence sufficient to support a belief that Acevedo committed the offense of aggravated homicide. Acevedo has presented evidence contradicting the Government's evidence with respect to the circumstances under which Alejandro gave his 2007 account implicating Acevedo in Prado Gonzalez's murder, but the Court cannot determine the credibility of the evidence offered by

---

[5]     Acevedo does not identify anything in the Treaty prohibiting supplementation of the government's evidence and does not challenge the supplementation, only its credibility and/or admissibility. Acevedo's Supp. Response at 4-5. Consequently, the Court exercises its discretion to allow supplementation. *See e.g., Yordanov v. Milusnic*, No. CV17-2034-CAS, ___F.Supp.3d___, 2017 WL 1405154, *5 (C.D. Cal. April 18, 2017) ("whether to permit such supplementation was a question committed to the sound discretion of the extradition court.")

Acevedo against the evidence offered by the Mexican government. That is a matter for trial in Mexico. *See Man-seok Choe v. Torres*, 525 F.3d at 740 (witness's alleged lack of credibility was "merely a weakness" in the Government's case, and did not "completely obliterate the evidence of probable cause") (citations and quotations omitted); *Barapind,* 400 F.3d at 749-50 (same); *and see Shapiro v. Ferrandina*, 478 F.2d 894, 905 (2d Cir.), *cert. dism'd*, 414 U.S. 884 (1973) (evidence that would poses conflict of credibility "should properly await trial in Israel.") (Friendly, J.). Because the Court has admitted and considered the allegations of coercion but cannot determine the credibility of the allegations, this, under *Santos*, ends the inquiry and "the court must certify the extradition." *Santos,* 830 F.3d. at 1007.

Accordingly, the Court finds that the evidence establishes probable cause to believe that Acevedo committed the crime charged against him in Mexico.

## ORDERS AND CERTIFICATION

Based on the above findings, and pursuant to 18 U.S.C. section 3184, this Court certifies that it has found Jose Manuel Cervantes Acevedo extraditable to Mexico with respect to the charge pending against him in Mexico.

A warrant may issue for the surrender of Jose Manuel Cervantes Acevedo upon the requisition of the proper authorities of the Government of Mexico, according to the terms of the Treaty.

IT IS FURTHER ORDERED that Jose Manuel Cervantes Acevedo shall remain committed to the custody of the United States Marshal, to be confined without bail until he is surrendered to the Government of Mexico pursuant to the applicable provisions of the Treaty.

IT IS FURTHER ORDERED that the attorney for the United States forthwith shall obtain transcripts of all proceedings before this Court and deliver those transcripts to the Clerk of the Court. The Clerk of the Court shall forward to the Secretary of State a copy of this Order, together with the transcripts and copies of documents on file herein. The Clerk of the Court also shall file herein a copy of the transcripts of all proceedings before this Court.

IT IS SO ORDERED.


DATED: August 11, 2017


_____
KAREN L. STEVENSON
UNITED STATES MAGISTRATE JUDGE